UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT FILED   3:12CR238 (JBA)

2012 NOV 27 PM 5 29

UNITED STATES OF AMERICA

v.

FREDERIC PIERUCCI

CRIMINAL NO. 3:12CR___(___)
U.S. DISTRICT COURT
VIOLATION: HAVEN, CT.

18 U.S.C. § 371 (Conspiracy)
15 U.S.C. § 78dd-2 (Foreign Corrupt Practices
Act)
18 U.S.C. § 1956(h) (Conspiracy to Commit
Money Laundering)
18 U.S.C. § 1956(a)(2)(A) (Money
Laundering)

INDICTMENT

The Grand Jury charges:

COUNT ONE
(Conspiracy)

At all times relevant, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States

Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among

other things, making it unlawful for certain classes of persons and entities to act corruptly in

furtherance of an offer, promise, authorization, or payment of money or anything of value to a

foreign government official for the purpose of assisting in obtaining or retaining business for, or

directing business to, any person.

2.     "Parent Company," a company whose identity is known to the Grand Jury, was

headquartered in France.  Parent Company was in the business of providing power generation

and transportation related services around the world.  Parent Company had sales of roughly €17

billion annually and roughly 75,000 employees in over seventy countries.  Shares of Parent

Company's stock were listed on the New York Stock Exchange until August 2004.  Accordingly,

until August 2004, Parent Company was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a). Parent Company had direct and indirect subsidiaries in various countries around the world, including a subsidiary in Connecticut, described in more detail below as "Power Company Connecticut." Through its subsidiaries, Parent Company bid on projects to secure contracts to perform power-related and transportation-related services, including for state-owned entities.

3.      One such project was the Tarahan Project (sometimes referred to simply as "Tarahan"). The Tarahan Project was a project to provide power-related services to the citizens of Indonesia that was bid and contracted through Indonesia's state-owned and state-controlled electricity company, Perusahaan Listrik Negara ("PLN"). PLN was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-(1)(f)(1) and 78dd-2(h)(2). PLN was responsible for sourcing the Tarahan Project.

4.      A number of Parent Company's subsidiaries were involved in the bidding for the Tarahan Project contract. These subsidiaries, described in more detail below, were Power Company Connecticut, "Power Company Switzerland," and "Power Company Indonesia" (collectively, the "subsidiaries").

5.      In addition, Parent Company and its subsidiaries retained two consultants, described in more detail below as "Consultant A" and "Consultant B," to assist them in obtaining the Tarahan Project contract. The consultants' primary purpose was not to provide legitimate consulting services to Parent Company and its subsidiaries but was instead to pay bribes to Indonesian officials who had the ability to influence the award of the Tarahan Project contract.

6.     The defendant, FREDERIC PIERUCCI ("PIERUCCI"), held executive-level positions at Power Company Connecticut and other Parent Company-related entities, as further described below. PIERUCCI was one of the people responsible for approving the selection of, and authorizing payments to, Consultants A and B, knowing that a portion of the payments to Consultants A and B was intended for Indonesian officials in exchange for their influence and assistance in awarding the Tarahan Project contract to Parent Company and its subsidiaries.

7.     Parent Company and its subsidiaries first retained Consultant A in or around late 2002. Consultant A was to receive a commission based on the overall value of the Tarahan Project contract, from which he was expected to pay bribes to Indonesian officials. However, through the course of 2003, PIERUCCI and others at Parent Company and its subsidiaries came to the conclusion that Consultant A was not effectively bribing key Indonesian officials. Accordingly, in or around September or October 2003, PIERUCCI and others informed Consultant A that Consultant A would be responsible only for paying bribes to Official 1, a Member of the Indonesian Parliament described in more detail below, and that Parent Company and its subsidiaries would retain another consultant to pay bribes to PLN officials. Shortly thereafter, Parent Company and its subsidiaries sent Consultant A an amended consulting agreement, reducing the amount of Consultant A's commission to reflect Consultant A's reduced responsibilities, and retained Consultant B to bribe PLN officials.

8.     Parent Company and its subsidiaries were ultimately awarded the Tarahan Project contract and made payments to the aforementioned "consultants," including payments to Consultant A, who then used a portion of these commission payments to pay bribes to Official 1.

## Parent Company's Subsidiaries and Consortium Partner

9.      "Power Company Connecticut," a company whose identity is known to the Grand Jury, was headquartered in Windsor, Connecticut, incorporated in Delaware, and thus a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).   Power Company Connecticut was in the business of providing power generation related services around the world.   Power Company Connecticut was an indirect subsidiary of Parent Company.

10.      "Power Company Switzerland," a company whose identity is known to the Grand Jury, was headquartered in Switzerland.   Power Company Switzerland was in the business of providing power generation related services around the world.   Power Company Switzerland was an indirect subsidiary of Parent Company.

11.      "Power Company Indonesia," a company whose identity is known to the Grand Jury, was headquartered in Indonesia.   Power Company Indonesia was in the business of providing power generation related services in Indonesia. Power Company Indonesia was an indirect subsidiary of Parent Company.

12.      Reflecting the close relationship between them, Parent Company, Power Company Connecticut, Power Company Switzerland, and Power Company Indonesia were often referred to simply as "Power Company" without distinction.

13.      "Consortium Partner," a trading company whose identity is known to the Grand Jury, was headquartered in Japan and performed work around the world, including in Indonesia. Consortium Partner acted as the partner of Parent Company, Power Company Connecticut, Power Company Switzerland, and Power Company Indonesia in the bidding and carrying out of the Tarahan Project in Indonesia.

## The Defendant and His Co-Conspirators

14. PIERUCCI held executive level-positions at Power Company Connecticut and other Parent Company-related entities, including Vice President of Global Sales. Thus, PIERUCCI was an employee and agent of a domestic concern, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). PIERUCCI's responsibilities at Power Company Connecticut included oversight of Power Company Connecticut's efforts to obtain contracts with new customers and to retain contracts with existing customers around the world, including the Tarahan Project in Indonesia.

15. "Executive A," an individual whose identity is known to the Grand Jury, was a Senior Vice President for the Asia region at Parent Company. Executive A's responsibilities at Parent Company included oversight of Parent Company's and Parent Company's subsidiaries' efforts to obtain contracts with new customers and to retain contracts with existing customers in Asia, including the Tarahan Project in Indonesia.

16. "Employee A," an individual whose identity is known to the Grand Jury, was a vice president of regional sales at Power Company Connecticut. Employee A's responsibilities at Power Company Connecticut included obtaining contracts with new customers and retaining contracts with existing customers in various countries, including the Tarahan Project in Indonesia.

17. "Employee B," an individual whose identity is known to the Grand Jury, was the General Manager at Power Company Indonesia. Employee B's responsibilities at Power Company Indonesia included obtaining contracts with new customers and retaining contracts with existing customers in Indonesia, including the Tarahan Project in Indonesia.

18.     "Employee C," an individual whose identity is known to the Grand Jury, was a director of sales at Power Company Indonesia.  Employee C's responsibilities at Power Company Indonesia included obtaining contracts with new customers and retaining contracts with existing customers in Indonesia, including the Tarahan Project in Indonesia.

19.     "Employee D," an individual whose identity is known to the Grand Jury, was a vice president of regional sales at Power Company Connecticut.  Employee D's responsibilities at Power Company Connecticut included obtaining contracts with new customers and retaining contracts with existing customers in various countries, including the Tarahan Project in Indonesia.

20.     "Consultant A," an individual whose identity is known to the Grand Jury, was a consultant who purportedly provided consulting related services on behalf of Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, and Consortium Partner in connection with the Tarahan Project in Indonesia.

21.     "Consultant B," an individual whose identity is known to the Grand Jury, was a consultant who purportedly provided consulting related services on behalf of Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, and Consortium Partner in connection with the Tarahan Project in Indonesia.

<u>The Foreign Officials</u>

22.     "Official 1," an individual whose identity is known to the Grand Jury, was a Member of Parliament in Indonesia and had influence over the award of contracts by PLN, including on the Tarahan Project.  Official 1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

23.     "Official 2," an individual whose identity is known to the Grand Jury, was a high-ranking official at PLN and had broad decision-making authority and influence over the award of contracts by PLN, including on the Tarahan Project. Official 2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

24.     "Official 3," an individual whose identity is known to the Grand Jury, was an official at PLN and was a high-ranking member of the evaluation committee for the Tarahan Project. Official 3 had broad decision-making authority and influence over the award of the Tarahan contract. Official 3 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1) and 78dd-2(h)(2).

## The Conspiracy

25.     From in or around 2002, and continuing through in or around 2009, in the District of Connecticut, and elsewhere, PIERUCCI did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly conspire, confederate and agree with Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, Consortium Partner, Executive A, Employee A, Employee B, Employee C, Employee D, Consultant A, Consultant B, and others known and unknown to the Grand Jury, to commit offenses against the United States, that is, being a domestic concern and an employee and agent of Power Company Connecticut, a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of

such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist PIERUCCI, Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, Consortium Partner, Executive A, Employee A, Employee B, Employee C, Employee D, Consultant A, Consultant B, and others in obtaining and retaining business for and with, and directing business to, Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, Consortium Partner, and others, in violation of Title 15, United States Code, Section 78dd-2(a).

## Purpose of the Conspiracy

26.     The purpose of the conspiracy was to make corrupt payments to a member of Parliament in Indonesia, officials at PLN, and others in order to obtain and retain business related to the Tarahan Project.

## Manner and Means of the Conspiracy

27.     The manner and means by which PIERUCCI and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

28.     PIERUCCI, together with others, while in the District of Connecticut and elsewhere, would and did discuss in person, via telephone, and via electronic mail ("e-mail") the need to obtain the contract to perform power-related services on the Tarahan Project.

29.     PIERUCCI, together with others, while in the District of Connecticut and elsewhere, would and did discuss in person, via telephone, and via e-mail making bribe

payments to government officials in Indonesia, including Official 1, Official 2, and Official 3, among others, in order to obtain the Tarahan Project contract.

30.     PIERUCCI, together with others, while in the District of Connecticut and elsewhere, would and did offer to pay, promise to pay, and authorize the payment of bribes, directly and indirectly, to and for the benefit of government officials in Indonesia, including Official 1, Official 2, and Official 3, in order to obtain the Tarahan Project contract.

31.     PIERUCCI, together with others, while in the District of Connecticut and elsewhere, would and did discuss in person, via telephone and via e-mail the manner and means by which the bribe payments were to be paid.

32.     PIERUCCI, together with others, while in the District of Connecticut and elsewhere, would and did attempt to conceal the payments to foreign officials by entering into consulting agreements with Consultant A and Consultant B in order to disguise the bribe payments to the foreign officials, including Official 1, Official 2, and Official 3.

33.     PIERUCCI, together with others, while in the District of Connecticut and elsewhere, would and did cause to be wired bribe payments from the bank accounts of Power Company Connecticut, Power Company Switzerland, and Consortium Partner to the bank accounts of Consultant A and Consultant B for the purpose of making payments to foreign officials, including Official 1, Official 2, and Official 3, in exchange for the officials' assistance in securing the Tarahan Project contract.

<u>Overt Acts</u>

34.     In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed or caused to be committed, in the District of Connecticut and elsewhere, at least one of the following overt acts, among others:

35.   On February 27, 2002, Employee C sent an e-mail to Employee A, stating, "Approaching [Official 1] still in the stages to motivate him be [sic] in our loop, if he was able to meet [Official 2] last week end [sic] just matter of introducing of himself that he will be as our sponsor.   We will identify when he will be seriously [sic] to meet [Official 2] to specific discussion for Tarahan, before it happen we should provide him more detail info regarding [a competitor of Power Company]."

36.   On or about June 14, 2002, Employee A sent an e-mail to Employee C, copying Employee B, with the subject line reading the first name of Official 1, and stating, "Pls start the paper work for using [Official 1's] representative company to assist in the BD [business development] effort.  If you need help with this let me know soon."

37.   On or about August 8, 2002, Employee C sent an e-mail to Employee A, to which he attached a document that explained, among other things, Official 1 was a "[k]ey legislator" and "Vice chairman of [the] Parliament commission 8 dedicated for Power & Energy" who had "[e]asy direct access personally to PLN Board" and who could exert "direct influence to PLN ([Official 2] and [another official])" and "utiliz[e] his comission [sic] 8 forum to influence PLN Board" and Ministries.

38.   On or about August 22, 2002, Employee B sent an e-mail to PIERUCCI, Employee A, and Executive A, stating, "Referring to our discussion of 8-August-2002, it is now 2 weeks away from the tender submission date.  Your position concerning the representation is urgently needed.  Currently, we are working with [Official 2] and [Official 3] in PLN on our 'competition', nevertheless, we would need a stronger push now.  Appreciate your decision a.s.a.p."

39.     On or about August 26, 2002, Employee A forwarded to Employee D and another employee of Power Company Connecticut an e-mail that Employee A had sent to employees of Consortium Partner discussing that Employee D would be replacing Employee A on the Tarahan Project, in which Employee A stated, "Please rest assured that [Power Company] still considers this project most important and is pursuing it most aggressively....I have brefed [sic] [Employee D] on the specific Tarahan issues, the bidding history, arrangement with [Consortium Partner and Power Company Indonesia], and also the arrangement with [Official 1].  Please feel confident in discussing these with [Employee D]."

40.     On or about August 28, 2002, PIERUCCI responded to the e-mail from Employee B referenced in Paragraph 38 above, and stated, "Please go ahead and finalise the consultancy agreement.  Please send me the key data so that I can approve it officially."

41.     On or about August 28, 2002, Employee A sent an e-mail to PIERUCCI, Employee B, Employee C, and Employee D, in response to PIERUCCI's e-mail referenced in Paragraph 40 above, and stated, "Regarding [PIERUCCI's] below message, Pls do not finalize anything yet with the Rep.  I spoke with [PIERUCCI] right after he sent the note and we have concerns about 1) politician vs. businessman, 2) upfront expenses, 3) right person vs. another choice.... We would like to discuss with you on Friday evening Jkt time."

42.     On or about September 4, 2002, PIERUCCI forwarded an e-mail from Employee B to Employee A, in which Employee B stated, "we have met [Official 1] to confirm whether he is comfortable with your suggested approach on Representation issue (through [Consultant A])."

43.     In or around late 2002, Parent Company, Power Company Connecticut, Power Company Switzerland, and Power Company Indonesia retained Consultant A, agreeing to pay

Consultant A three percent of the Tarahan Project contract value as a commission, which agreement was memorialized in a consulting agreement in or around March 2003.

44.     On or about December 19, 2002, Employee D sent an e-mail to PIERUCCI and other employees of Power Company with the subject, "Tarahan status," stating, "[m]et our friends on the evaluation team and they will still be helping us combat [a competitor of Power Company].  We nmeed [sic] to feed some more info and I'll discuss at home.  Upper echelon covered as well."

45.     On or about April 17, 2003, Consultant A sent an email to PIERUCCI, Employee A, and Employee D regarding the Tarahan Project and another upcoming project at PLN, stating that, in connection with the new project, "[w]e need to keep the commission at the same level as TARAHAN" and that "I can get [Official 2] to Europe in the second half of June.  Please make sure you have adequate funding to really take care of them.  He will be coming with his wife and so would [Official 1].  If you can not afford it, i [sic] will just drop the subject.... I need a firm response from you by next wednesday [sic] so when [Official 2] comes I meet everyone and formally invite them."

46.     In or about August 2003, Consultant A had a meeting with Employee D in which Consultant A said that members of the PLN evaluation committee were unhappy with the amount of money they were receiving and that Consultant A needed to pay additional money to members of the evaluation committee.

47.     On or about August 12, 2003, Consultant A sent an e-mail to PIERUCCI about another upcoming project at PLN, stating, "PLN people are upset with us that we told them we only need marginal support from them and now putting everything on them.  They are comparing the success fee for Tarahan and [the other project] and asking why they are so much different."

48.     On or about September 16, 2003, after receiving an e-mail from an employee of Consortium Partner stating that the PLN evaluation team had provided negative feedback, PIERUCCI forwarded the e-mail to Employee D and Consultant A, copied Employee B and Employee C, and stated, "When we spoke on Friday , [sic] you both told me that everything was under control in the evaluation . . . . Now, if the infos below are correct, we are not only evaluated number 2 but by a huge margin (almost $40M!!!!!!!!!!!!!!!!) HOW CAN THAT BE?? I thought we were controlling what was happening in Palembang?????? Please check asap if teh [sic] below infos are correct and give me by tomorrow a plan to recover this. WE CAN NOT LOOSE [sic] THIS PROJECT!"

49.     In or around September or October 2003, PIERUCCI, Executive A, and other employees of Power Company and Consortium Partner told Consultant A at a meeting in Indonesia that: (i) they were going to retain another consultant to pay bribes to officials at PLN in connection with the Tarahan Project; (ii) Consultant A needed to pay bribes only to Official 1; and (iii) Consultant A's commission, therefore, would be cut from three percent of the total value of the contract to one percent.

50.     In or around October 2003, Parent Company, Power Company Connecticut, Power Company Switzerland, and Power Company Indonesia sent an amended consulting agreement to Consultant A in connection with the Tarahan Project reflecting the reduced commission rate of one percent.

51.     On or about October 8, 2003, Consultant A sent an e-mail to PIERUCCI stating, "The contract is basically fine. [Official 1] is trying to verify that in case he has to do horse trading with [another official], the expenses are not coming from my contract but he has not managed to talk to [Official 2] directly, in part because he does not want to address the issue

directly. I have one minor comment though. Could you fix the payment dates for the 30% and 70%? First portion at the activation of the contract, when it is signed and the down payment is made and the second one four months or six months thereafter. Given the nature of my involvement (or lack of) with PLN under the new scheme, my friend and I do not want to be involved in the PLN performance and payment issues. Finally, I have not been able to get a contract out of [Consortium Partner] even though they keep saying there is no problem. They also told [Official 2] that they do not have a firm commitment to me yet and that has not sat well with [Official 1]. So please give them a nodge [sic]. Hopefully we can sign both contracts at the same time."

52.     On or about March 3, 2004, Employee B sent an email to Executive A, stating, "Last Monday we sent Tarahan CA [consultancy agreement] to [Consultant B], he immediately feel [sic] cornered after reading the ToP [terms of payment] which said 'prorata'. When I talked to him on the phone I said that I will look at it and I thought it should not be that bad. I then looked into Tarahan ToP (see attached) and realise that the project payment is spread over 3.5 year! You would understand why he is worry [sic], he is willing to pre-finance his scope, fulfilling his commitment up-front (prior he get paid) to get the right 'influence', but certainly not waiting 2 to 3 years to get paid while most of his scope is completed in the beginning."

53.     On or about March 10, 2004, Employee D sent an e-mail to PIERUCCI, Executive A, and others, stating, "I have [Employee B] out in Indonesia negotiating the CA Terms with [Consultant B].  As you know, the Tarahan estimate can not [sic] tolerate such advance payments and I'm not sure how we can accommodate this."

54.     On or about March 18, 2004, Executive A responded to the e-mail from Employee D referenced in Paragraph 53 above, stating, "Not sure where we are with this but for

your info [Consultant B] is also requesting tougher terms on other projects at the moment. I cannot comment on your cash flow but my advice in this instance is to go with the latest recommendation . . . [Consultant B] has a lot of work to do to support us in negotiation and he (and others) are slightly negative at the moment on [Parent Company] support."

55.    On or about March 22, 2004, Employee D sent an e-mail to Executive A, stating, "I have seen your response and wish to offer the following as our compromise to [Consultant B's] proposal: Instead of this could we suggest something like:

   -40% at receipt by [Power Company] of the down payment

   -Additional 40% at receipt by [Power Company] at month 12

   -Additional 15% at receipt by [Power Company] at month 18

   -Last 5% at the end of the contractual obligations

Pls advise if these you think would be acceptable??"

56.    On or about March 22, 2004, Employee D sent an e-mail to several employees of Consortium Partner, stating, "I am trying to get agreement with [Consultant B] but he's objecting strongly and asking for 'front-end' payments which affect our cash flow. I consider both you and I as having similar payment schemes for [Consultant B], therefore pls share with me your proposal and idea. Do you have agreement yet with [Consultant B] for your portion?? Pls consider this as an urgent request and respond at your most earliest convenience."

57.    On or about March 23, 2004, Executive A sent an e-mail to PIERUCCI and Employee D, stating, "Spoke to [Employee B] at length today. Problems he identified are driven by Elections – driving short term thinking re TOP etc, plus actions by our competitors on a number of fronts . . . There seems to be a general perception that some of our competitors are more generous in a no of ways. On Tarahan it seems we must offer circa 12 months for majority

of payment. Proposal is 40% D/P [down payment], 35% month 6 and 20% month 12 with 5% on completion. [Consultant B] looking for bettter [sic] but if you agree we should try this. understand [sic] it is difficult but we need help and commitment during negotiation phase."

58.     On or about March 30, 2004, Executive A sent an e-mail to PIERUCCI and Employee D, addressed to Employee D, stating, "To clear up any confusion. You proposed an 18 month schedule but it will not fly in Indonesia at this time. In my discussion with [PIERUCCI] and mails as per attached I recommended that we go with the latest proposal: 40/35/20/5. [Consortium Partner] wait for us and will follow suit. We are all agreed the terms are lousy but there is no choice. [Employee B] sees [Official 2] tomorrow and needs to confirm this position. Can you give him the all clear today?"

59.     On or about March 30, 2004, Employee D sent an e-mail in response to Executive A's e-mail described in Paragraph 58 above, stating, "Approval has just come regarding the terms (40/35/20/5). Yes, I agree they are lousy terms but as you and I talked last week, we both believe we have no choice. I will send a separate message to [Employee B, Employee C, and two employees of Consortium Partner] regarding the T/P to insure we get [Consultant B's] signature and follow-up action with our friends. A note from you as well to [the two Consortium Partner employees] would be helpful given [Consortium Partner's] thus far objections to such 'front-end' loading of payments."

60.     On March 30, 2004, Employee D sent an email to employees at Consortium Partner, stating, "As we discussed last week by telephone, [Consultant B] is requiring 95% payment within the first 12 months of the contract. I stated that this was a problem for [Power Company] however after speaking with [Employee B] and [Executive A], I am now convinced that this mode of payment is necessary for the continuation of [Consultant B's]

effectiveness....As mentioned by you last week, [Consortium Partner] confirmed to follow [Power Company's] actions and conclusions for the [Consultant B] Agreement."

61.     On or about March 30, 2004, Employee D sent an e-mail to PIERUCCI, Executive A, and Employee B, stating, "Approval...has finally been received this morning authorizing the requested Terms of Payment. Pls proceed with this ASAP to obtain the CA signing by [Consultant B] in order for [Consultant B's] effectiveness to continue."

62.     On or about March 31, 2004, Employee B responded to the e-mail from Employee D referenced in Paragraph 61 above, stating, "I will mentioned [sic] our position to [Official 2] and [Consultant B] this afternoon. Furthermore I would suggest you to contact [the employee at Power Company Switzerland responsible for consultancy agreements] with a request to make the necessary CA changes (ToP) and ask her to send me the revised CA asap. Once the revised agreement arrived I will obtain [Consultant B's] signature. Mean while [sic] I will give [Official 2]/[Consultant B] my word."

63.     In or around April 2004, Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, and Consortium Partner entered into a finalized consulting agreement with Consultant B in connection with the Tarahan Project.

64.     On or about May 22, 2005, after Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, and Consortium Partner secured the Tarahan project, Consultant A sent an e-mail to Employee D, stating, "I will call you this week and find out the amount of invoice I need to submit to you, as the contract amount you sent me is for the entire contract."

65. On or about November 16, 2005, Power Company Connecticut wire transferred $200,064 from its bank account to the bank account of Consultant A in Maryland, part of which was later used by Consultant A to pay bribes to Official 1.

66. On or about December 8, 2005, Consultant A sent an e-mail to Employee D, stating, "Good morning from Jakarta. [An official from PLN] keep contacting me and asking for ...support. He has not been contacted by you or your local team. Could you please give him a call and let him know I have nothing to do with him. It is really important." (Ellipses in original).

67. On or about December 9, 2005, Employee D forwarded to Employee B and Employee C, copying PIERUCCI, the e-mail from Consultant A referenced in Paragraph 66, and stated, "This has gone on way too long. Please take care of this. Please advise when this is completed and settled. As you are fully aware, [Consultant A] has nothing to do with PLN. There was a complete and clear division of responsibility."

68. On or about January 4, 2006, Power Company Connecticut wire transferred $200,064 from its bank account to the bank account of Consultant A in Maryland, part of which was later used by Consultant A to pay bribes to Official 1.

69. On or about March 7, 2007, Power Company Connecticut wire transferred $200,064 from its bank account to the bank account of Consultant A in Maryland, part of which was later used by Consultant A to pay bribes to Official 1.

70. On or about October 23, 2008, Consultant A contacted Employee D, who no longer was employed by Power Company Connecticut, and asked Employee D for help in getting Consultant A's final invoice paid by Power Company Connecticut.

71.    On or about October 23, 2008, Employee D sent an e-mail to an employee at Power Company Connecticut, stating, "How have you been [] and assume your [sic] still the $$$'s man!! I've been in touch with [Consultant A] over the last couple of years and today he had sent me a quick note to investigate his final payment which he claims is overdue. He had made his submittal of his final invoice over ~ 11 months ago.. [sic] Would you pls investigate and advise accordingly."

72.    On or about October 24, 2008, Employee D sent an e-mail to Consultant A and stated, "I contacted the office to determine the delay in your final payment. No word yet."

73.    On or about September 3, 2009, Consultant A sent an e-mail to Employee D stating, "I still have not been paid by [Power Company Connecticut] for my last invoice. With [Employee A] and [another employee] out of the office, I do not know anyone else there."

74.    On September 4, 2009, Employee D sent an e-mail to PIERUCCI, stating, "I know this is no longer under your responsibility but [Consultant A] has once again contacted me given NON PAYMENT of his final invoice. [Employee A] was his only contact but as you know is no longer employed [] so no one in Windsor can give any assistance. Please see what you can do to help."

75.    On or about September 4, 2009, PIERUCCI sent an e-mail in response to Employee D's e-mail described in Paragraph 74 above, stating, "I know. [Consultant A] contacted me already. I will see what I can do."

76.    On or about September 4, 2009, Employee D sent an e-mail to Consultant A, forwarding the e-mail from PIERUCCI described in Paragraph 75 above, stating, "Hope[] [PIERUCCI] can help and not just 'blow'n smoke.'"

77.     On or about October 5, 2009, Power Company Connecticut wire transferred $66,688 from its bank account to the bank account of Consultant A in Maryland for use in bribing Official 1.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FIVE
### (Foreign Corrupt Practices Act)

78.     Paragraphs 1 through 24 and 26 through 77 are realleged and incorporated by reference as though fully set forth herein.

79.     On or about the dates set forth below, in the District of Connecticut and elsewhere, PIERUCCI, being a domestic concern and an employee and agent of a domestic concern, did willfully use and cause to be used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist PIERUCCI, Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company Indonesia, Consortium Partner, Executive A, Employee A, Employee B, Employee C, Employee D, Consultant A, Consultant B, and others in obtaining and retaining business for and with, and directing business to, Power

Company Connecticut, Power Company Switzerland, Power Company Indonesia, Parent Company, Consortium Partner, and others, as follows:

| COUNT | DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------|---------------------------------------------------------------------|
| Two | 11/16/2005 | Wire transfer in the amount of $200,064 from Power Company Connecticut's bank account to Consultant A's bank account in Maryland for use in bribing Official 1. |
| Three | 1/4/2006 | Wire transfer in the amount of $200,064 from Power Company Connecticut's bank account to Consultant A's bank account in Maryland for use in bribing Official 1. |
| Four | 3/7/2007 | Wire transfer in the amount of $200,064 from Power Company Connecticut's bank account to Consultant A's bank account in Maryland for use in bribing Official 1. |
| Five | 10/5/2009 | Wire transfer in the amount of $66,688 from Power Company Connecticut's bank account to Consultant A's bank account in Maryland for use in bribing Official 1. |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

<u>COUNT SIX</u>
(Conspiracy to Commit Money Laundering)

80.    Paragraphs 1 through 24 and 26 through 77 are realleged and incorporated by reference as though fully set forth herein.

81.    From in or around 2002, and continuing through in or around 2009, in the District of Connecticut and elsewhere, PIERUCCI did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Parent Company, Power Company Connecticut, Power Company Switzerland, Power Company

Indonesia, Consortium Partner, Executive A, Employee A, Employee B, Employee C, Employee D, Consultant A, Consultant B, and others known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Sections 1956 and 1957, namely:

a. to knowingly transport, transmit and transfer monetary instruments and funds from a place in the United States to places outside the United States, with the intent to promote the carrying on of a specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1956(a)(2)(A); and

b. to engage in a monetary transaction by, through and to a financial institution, in and affecting interstate and international commerce, in criminally derived property that was of a value greater than $10,000.00, that is, the deposit, withdrawal, transfer and exchange of United States currency, funds and monetary instruments, such property having been derived from specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2, in violation of Title 18, United States Code, Section 1957.

Manner and Means of the Conspiracy

82. The manner and means by which PIERUCCI and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

83. PIERUCCI, while located in the District of Connecticut and elsewhere, together with others, would and did discuss in person, via telephone, and via e-mail the instructions for sending money to Consultant A's bank account in Maryland.

84. PIERUCCI, while located in the District of Connecticut and elsewhere, together with others, would and did direct the wire transfer of, and cause to be wired, money from Power Company Connecticut's bank account to Consultant A's bank account in Maryland for the purpose of concealing and disguising the bribe payments to Official 1.

85. Consultant A would and did take a portion of the money paid to Consultant A's bank account in Maryland and engage in monetary transactions designed to conceal the source of the moneys and the fact that they were bribes to Official 1.

86. Consultant A would and did take all or a portion of the money paid to Consultant A's bank account in Maryland and engage in monetary transfers designed to promote the payment of bribes through international monetary transfers for the benefit of Official 1.

87. Consultant A would and did take all or a portion of the money paid to Consultant A's bank account in Maryland and engage in monetary transactions designed to engage in monetary transactions of a value greater than $10,000 using criminally derived property.

88. Co-conspirators would and did direct the wire transfer of, and cause to be wired, money from Power Company Switzerland's bank account in Switzerland to Consultant B's bank account for the purpose of concealing and disguising the bribe payments to foreign officials at PLN, including Official 2 and Official 3.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS SEVEN THROUGH TEN
### (Money Laundering)

89. Paragraphs 1 through 24, 26 through 77, and 82 through 88 are realleged and incorporated by reference as though fully set forth herein.

90. On or about the dates set forth below, in the District of Connecticut and elsewhere, PIERUCCI did knowingly transport, transmit, and transfer, and aid, abet, and cause others to transport, transmit, and transfer, and attempt to transport, transmit, and transfer the following monetary instruments and funds from a place in the United States, namely Maryland, to a place outside the United States, namely Indonesia, intending that each of the transactions, in

whole and in part, promote the carrying on of specified unlawful activity, that is, a felony violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-2, as follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Seven | 12/14/2005 | Wire transfer in the amount of $100,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |
| Eight | 3/1/2006 | Wire transfer in the amount of $100,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |
| Nine | 8/8/2006 | Wire transfer in the amount of $80,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |
| Ten | 3/9/2007 | Wire transfer in the amount of $80,000 from Consultant A's bank account in Maryland to a bank account in Indonesia for the purpose of paying Official 1 to promote the carrying on of the bribery scheme. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

A TRUE BILL

_____
FOREPERSON

_____
DAVID B. FEIN
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

_____
DENIS J. McINERNEY
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

_____
DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY

_____
DANIEL S. KAHN
TRIAL ATTORNEY